Before we begin the argument, I just want to be clear on the time division, because we've got an appeal and a cross-appeal here, right? Correct. And you didn't split up, which is fine if you don't, but you didn't split up your time of 15 minutes, so you don't want to necessarily reserve any of that time to respond. Correct. Excellent. Thank you. Okay. Mr. O'Connor. Thank you. And may it please the Court, I'd just like even one quick opening statement before I'm sure you're going to have questions. Jumped on your throat? Yes. Yeah. That's the legal term. In Jez's photo, which is the case causing all problems for my clients, the one statement that's very short, that is relevant, is, quote, United States patent rights are not exhausted by products of foreign provenance. To invoke the protection of the first sale doctrine, the authorized first sale must have a patent, see Bosch versus Graf, a lawful foreign purchase does not obviate the need for license from the United States patentee, et cetera. Now, I pointed out in my brief that the extinguishment has to be done by the patentee. Now, I didn't quote Quanta for that proposition, but in reading the case over last night, on page 16 of Quanta, it specifically says, quote, exhaustion is triggered only by a sale authorized by the patent holder. So even if there was some question as to the state of the law regarding whether or not a sale has to be by the patent holder, which I think was a well-established proposition at that time anyway, but it was affirmed in Quanta. So Bosch really... Do you want to talk to us about Kurt Sang? Sure. That's your main appeal. Well, that's my main appeal, but it also relates to the fact that I think Quanta was, I mean, Jazz Photo was wrongly decided to do it versus... Yeah, I mean, even if Jazz Photo relied on a case that's distinguishable or you think was wrongly decided, there's nothing we as a panel could do about that unless you're intervening Supreme Court law to tell us what to do. Correct, I agree with that. So Kurt Sang is the intervening case. And what Kurt Sang did was, to me, quite simply, they stated the general proposition, going back to Lord Koch, back in whenever it was, long before there were patents and trademarks, that when you sell a product, your rights in that product are extinguished by virtue of the first sale. That was the general proposition. The exception to that proposition being... No, we understand that, but as the district court pointed out here, and we have to be particularly mindful of that to the question that Judge O'Malley asked you, which is, there are several questions here, and one of them is what we as a panel have the authority to do independent of the en banc court. Right. So as I understand it, you can tell me if you disagree, we only have that authority if it's kind of crystal clear or pretty certain that the Supreme Court's opinion in Kurt Sang dealt with and decided this issue for purposes of patent law and not just copyright law. Correct. So why isn't the fact that the Supreme Court spent so much effort and included its analysis, not exclusively Lord Koch and the common law, but the statutory provisions, the context of libraries and bookstores, etc., etc., seems to me that a fair reading might be that the Supreme Court was looking at all of those factors together. And therefore, why wouldn't that at least compel a reconsideration and not that this case decides our case? The answer to that is as simple as what was going to go a second ago. The general law prevails unless there's an exception in the statute. And if you look at all the arguments that were being made on that copyright case, was that there was an exception in the statute. And so all of the discussion of analysis of the context of the copyright statute was all directed to finding out whether or not there was an exception. The defendant in that case did not challenge, I'm sorry, the plaintiff in that case did not challenge whether or not the general proposition applied to first sales overseas. It was arguing that the statute, the way it was written, had an exception because the sales were legal versus illegal and so on. That's the general proposition. So if you read that case carefully, and I have many times, hopefully I got it right, is that that was the analysis. Is there an exception under the copyright statute to the general rule? And they concluded there was not. So that doesn't change the general rule. So the general rule applies across the board to all sales of property, which all would have to include patent rights as well. So I think clearly if you accept that general rule, and I don't see any way the court cannot, then Jazz Photo is clearly at odds with that general rule. Even if you say that that's the way it was argued, that's not the way the opinion is written, is it? I mean, the opinion says we have to engage in statutory interpretation. And it begins with, and it does a whole variety of statutory analyses, and then says, and consistent with the statutory interpretation, we look to the principle of the fact that the common law was the background for the statute. And then they say the common law supports our conclusion under the statute. Isn't that really the way? The way I read the case is they say here's the general proposition. The plaintiff is arguing there's an exception to that general proposition because of the copyright statute. And the entire analysis was looking at it, what does the copyright statute say in general? But what does it say with regard to that proposition? I understand your argument with regard to that factor, but the Supreme Court also relied and spent at least some time talking about the threat to ordinary scholarly, artistic, and commercial and consumer activities, et cetera. So I understand what you're saying about they had to look at the statute, even if they wanted to wholeheartedly adopt common law to just make sure Congress hadn't changed it. There were other factors that they looked to and seemingly relied on as well, and no one has yet analyzed those factors in connection with HATMA in general or with exhaustion as applied to HATMA, right? That's correct. So we might conclude, therefore, even if we thought it was generally applicable, that those factors cut the other way, and wouldn't it therefore be fair to say that Curtship doesn't apply to HATMA? Okay, there'd have to be some analysis as to why the general proposition doesn't apply to HATMA. The difference is HATMA is much simpler. There is no statute that can be construed as saying that there's an exception to the general rule, there's a first sale overseas. There's nothing in the statute of any of that sort. That was entirely created by this Court, which we understand to overturn there has to be a clear statement by the Supreme Court. I really don't think those other factors cut against in any way, shape, or form the general law, which was, at the end of the day, that was their decision was quite reasonable, quite simple. Here's the general rule, we'll look at the copyright statute. Well, that's not right. I think that just as much as I appreciate your saying that given the statute they would have to look at common law that preceded it, and that's what necessitated their look at the statute, they didn't have to. If common law is the beginning and the end of our analysis with respect to this question, then they didn't have to cite and rely on those other factors in the economy and speak to them, right? Well, they didn't have to, and I don't think they did have to. I think they chose to. I think they wanted to do a thorough analysis and discussion of the copyright law and all the things that were affected by the copyright law. But at the end of the day, that's the narrow holding, as I read it. So the entirety of the principle that we're supposed to rely on is taken from one paragraph? Well, that's a pretty long paragraph, and yes. It's a long paragraph. It wasn't like a throwaway or a footnote. I mean, it was pretty central to their analysis, and they quoted extensively from Lord Coke, and they said it was a long pedigree. I forget the exact terms. Yeah, I mean, that's an interesting statement, a long pedigree, and yet they only cite to one thing, one paragraph. So what else have you found that tells us that this pedigree is long in the patent arena? Nothing other than that general principle. In the patent context, there's only one case that relates, really, other than a couple that have followed it, and that's Jazz Photo. It's the only law out there, Supreme Court or otherwise, that deals with this issue of why there's an exception for overseas sales. This is it. Jazz Photo came basically out of nowhere with no Supreme Court, even though reports rely on POSH, it's not a proper reliance, and there's nothing else in Jazz Photo. It's that one sentence. So the question is, is there anything else? There isn't anything else. What about the fact that the entire statutory scheme in the patent arena is very focused on avoiding extraterritoriality? Well, I don't see that it is. I mean, the entire patent scheme, and I've been doing this for 46 years, I've never seen anything indicating in the patent statute any place that there should be some sort of exception to first sale. In fact, I don't think the first sale is even in the statute. That's a common law, but it's a common law going all the way back to Adams v. Do you recognize that what you're urging us to do is pretty dramatic? I do. I want you to understand it would be a change, and we haven't had a lot of cases, and I don't know exactly why that's true in this area of exhaustion, but it would dramatically affect the way companies operate globally and what they do, right? Well, that's why I'm here, because the present law has dramatically affected the way companies do business in a negative way. And not only that, I didn't want to get a feel, but right now in Europe we have protectionism going on over there because all the countries in Europe are now considering and are going to pass, there's no doubt, no question from the people I know, they're going to pass the same basic law as it relates to Europe. So first sale extinguishment only applies to sales made in Europe. That's a direct political reaction to the decision by this court in Jazz Photo. It's like... That decision's been on the books for a while. I'm sorry? It's not like that decision came down yesterday. I know, but I'm saying it's taken them a while in Europe to get around to doing that. Europe Council works fairly slowly and they all have to get in line. But I'm saying that process started right as soon as Jazz Photo came down. It's just not culminating. So the other issue on Quanta and Malacroft, that's an issue for rebuttal. So why don't we hear from the other side? If I could just, one quick thing. The other alternative is En Blanc, which I asked this court to do in the case where I represented Ninestar, ITC case. And Ninestar got hit with an $11 million fine for selling cartridges that had been bought, purchased, used, spent, thrown away. And I asked this court then to please consider En Blanc's review. It didn't. Hopefully, if you're not willing to overturn the panel, at least maybe we could suggest this go up for En Blanc's review because that is a, basically, Jazz Photo is a terrible case. Thank you. Mr. Meese? Yes, please. May it please the court, the district court did not err on the Jazz Photo issue. However, with respect to Lexmark's return program, the district court erred by failing to follow binding precedent. Well, let me ask you about the first issue, right? The one that we were talking about with your friend. Why is it not a fair reading of the Supreme Court's opinion in Kersing to say, as your friend said, they relied really at common law. The only reason they looked at the statute is because they had to because the statute obviously could have impacted on common law that preceded it. We don't have the statutory provisions here. Why isn't that the end of the story? In other words, there's no daylight between patent law and copyright law as it applies to exhaustion. I would start first with Bob Smerrill saying that copyright law is not necessarily applicable to patent law, nor is it vice versa. And further, with respect to Kersing... But the Lord Cooke quote would be equally applicable to both patent and copyright law, would it not? It could, but the applicable language, to the extent we're going to go back to the 1600s and talk about Lord Cooke, is that... Well, the Supreme Court, good enough for the Supreme Court, good enough for me. That's fine, but the applicable phrase in that writing was whether the seller has deprised himself or herself of the quote-unquote whole interest in the intellectual property right or the property right. In this case, we're talking about a U.S. patent right. Under Bosch v. Graf, under Jazz Photo, there's been... Well, Bosch is really distinguishable, isn't it? I mean, you rely heavily on it in your brief and act like the Supreme Court has laid down the law here, but that case really turned on a sale that was authorized by a foreign patent holder under a different patent, not one authorized by this particular patent holder. So I disagree, however, with respect... Do you disagree with my description of the case? Maybe my understanding of the facts of the case. There was certainly an authorization under Bosch for the foreign dealer. The dealer was authorized to sell the patented item. The item was then imported into the United States. Right, but he was authorized by a holder of a European patent that was not the same person or entity as the holder of the U.S. patent. Correct, but I guess the distinction I was coming back to, which is I thought the point Mr. O'Connor was making, was trying to draw a distinction between an authorized dealer or licensee or if the sale was coming directly from a patent owner. No, he was trying to draw a distinction between the ultimate authorization coming from the U.S. patent owner and the ultimate authorization coming from the owner of a foreign patent. Those are very different things. Okay, I'll stipulate to that. I would stipulate to that. With respect to this particular case, though, and Lord Cook, the operative language, though, is the whole interest and whether or not the U.S. patent owner has been deprived of his or her right in that whole interest. Kirk Sang, nothing in Kirk Sang indicated that the Supreme Court intended to completely overhaul the patent laws regarding exhaustion. Setting aside the Bosch versus Graf issue, there wasn't a reference to patent.  But Cook's language was actually referring to chattels. In some ways that's more applicable to patents than it is to copyright, is it not? Well, it's still a property right, but I still think the applicable language from Cook, Lord Cook, is whether or not you've been deprived of your whole interest. In this case, for example, with respect to the return program, we've only been deprived of a portion of our interest, a single-use portion of the interest. Well, what were the facts in Kirk Sang? Was it Wiley & Sons, Wiley & Company, the book publisher? They weren't deprived of their whole interest. Correct. That was different because the first sale doctrine was codified in Section 109 of the Copyright Act and exhaustion turned on the legislative language and history in there. The question was whether or not— Well, isn't it a fair statement to say that the Supreme Court's analysis of the legislation in that case, they started with common law and then they looked at the statute and said, is there anything the statute has done or said to disrupt the common law view at the time the statute was enacted? Wasn't that the reliance on the statute in that case? Yes, that was a fair statement. That was part of the analysis. And they also looked at the legislative history where territorial aspects of statute were phased out during legislation. Yes, but that has nothing—but they started—they began and ended with common law. So why don't we in the patent context, since we don't have those statutory provisions, begin and end with common law the way they did? I think in this particular instance, because patent exhaustion has not been codified and because we have about 150 years' worth of case law from the Supreme Court and since 1983 from the Federal Circuit dealing with exhaustion in the patent context. So you're right. It would—Kirksang and Jayasoto are not clearly irreconcilable with one another. Certainly, it's not crystal clear. Okay, you want to turn to your next issue? I would. Yes, please. With respect to the second issue, the Lexmark's Return Program, Malincroft is the law of the circuit and it followed general talking pictures which held that a license that restricts the right to sell or use a patented item is valid and enforceable unless it exceeds the scope of the patent grant. Quanta did not overrule Malincroft and the two cases are not clearly irreconcilable with one another. Well, where's the license here? What's the agreement? You call it repeatedly, I think, a conditional sale. Where's the conditional sale here? So it's in the stipulation. It's the Return Program License Agreement. It's a combination, conditional sale, single-use-based restriction. But wasn't the point in general talking pictures was that it was the right to sell that had been conditioned, not the right to use? No. I think that Prinko, for example, in discussing general talking pictures in Malincroft made clear that it was a... I don't have the exact case site. But the inquiry is... Exhaustion is going to turn on the exact language of the license agreement. So the first inquiry is whether or not the restriction is inside or outside the scope of the patent grant. If it's outside the scope of the patent grant, it's going to be unenforceable. If it's inside the scope of the patent grant, then we have to look at whether or not it's a conditional or unconditional sale. With respect to an unconditional sale, such as in Adams, Bloomer, Keeler, and Quanna, that's obviously going to trigger exhaustion. Where it was a conditional sale, such as Mitchell v. Hawley, general talking pictures, Malincroft, and in this particular case, exhaustion is not going to apply. It's reacting within the scope of the patent grant and... Well, tell me what the conditional sale was here. In this case, the conditional sale is it's sold to the customer subject to a single-use-based restriction. The customer is given a choice between two cartridges. Is there a license agreement with the customer? Yes. Is there any kind of contractual serious? Yes. It's stipulated that the return program is a valid, enforceable, conditional sale, and single-use license. That wasn't my question. Okay. Is there some sort of license agreement between the seller and the purchaser? Yes. And the document says... Yes. And it says you are only licensed, you are only allowed to use this for this purpose and not for any other? Yes. So, for example, at paragraph 16 in the stipulation in appendix 2562, this is an example of the express and enforceable contract with each of the authorized supplies, dealers, and distributors. The exact language... Oh, are we allowed to talk about this stuff? It's market confidential? Yes. Yes. This is fine. The return program license is public. That's public. So why did you mark it confidential? Because the actual, the other financial terms of these contracts with the individual suppliers and distributors, the channels of distribution, the number of... Where are those financial numbers? The financial numbers are not in the document. The exact parties with whom we have these agreements, those are not public. I don't understand. Why did you mark this confidential? Is there anything in what's marked confidential in the appendix with regard to the license? Is it confidential or non-confidential? There are parts that are confidential. Okay. Can you give me an example just because, I mean, we're in a position of having to arguably write an opinion and know what we can say and what we can't say and we're severely constrained when everything is marked confidential but only portions of it really are. I understand. So... Because I don't see any numbers. You mentioned certain numbers and so forth and at least in this agreement, I'm just looking at it quickly now looking for numbers, but I don't really see any. There are no numbers in this agreement. The stipulation itself had exhibits to it. The exhibits were replete with financial documentation and numbers, terms for the contracts with the authorized supplies dealers and authorized distributors. But in the appendix from 2553 through 2566, nothing is confidential. Sorry. It's a question. Yes. The portions here that would be confidential would be, for example, in paragraph 17 where there's references to various types of programs. Those are not, as I understand it, publicly available. There's a series of these from 16 through 23. Paragraph 16 through 23. Right. The rest of it is okay. But the applicable, going back to your question about the license language itself, the license language itself can be found in Exhibit E which is referenced in paragraph 16. Return program cartridges are sold at a discount versus the pricing. I'm sorry. I'm lost. Are we on 2562? 2562 references Exhibit E at the bottom of the paragraph. Yes. I'm going to read you the expressed language from that contract. Is that in the appendix? It wasn't cited by anybody. It's in the record. It's not in the appendix. It's numbered. The contracts themselves are not in the appendix. It's in the district court record. You don't have a contract claim here, right? There's no contract claim, correct. It's for... The Supreme Court describes general talking pictures as a license that limited the buyer to selling antithetical hires for private and home use and it said that they then tried to sell it outside the bounds of that license. Do you not see a distinction between a license to sell that's conditional and a license to use that's conditional? I think that there can be a distinction. In this case, they're tied together. It's a conditional sale with a single-use restriction. You cannot buy the cartridge unless you agree to the single-use condition. So it's different than Malacroft where there was just simply a notice attached and arguably, as some people want to refer to it, as a post-sale use restriction. This is different. This is up front. It's part of the contract. The return program cartridge is sold subject to a discounted price that the consumer is going to use the cartridge one time and then return it only to Lexmark. I thought you told Judge O'Malley there wasn't a contract claim. There's no contract claim. The license is part of the contract. We're not suing our end users or our customers for a breach of contract. But any use of the cartridge beyond the term of the license is going to constitute patent infringement, which is what this case is about. And the license is contained within the contract? So it's contained in multiple parts. It's contained with the resellers. It's undisputed. It's contained in Lexmark's agreement with the resellers. They only have limited... Is that in the exhibits, in the appendix? Yes, in paragraph 23 of the stipulation at A2564. Lexmark sells the return program cartridges to the resellers at a discounted price which reflects the value of the property rights conveyed to Lexmark. The resellers are only authorized to resell the return program cartridges subject to the contractual return program condition. And they also sell regular cartridges in which they've received full compensation and their rights have been exhausted. Let me... Is there any... Will you say the underlying document for this? I mean, this is a stipulation. It's just hard to deal with this when we don't have the underlying document. The underlying document... The resellers are only authorized to resell the return program. What is that based on? It's based on the stipulation, undisputed fact. That's exactly what the contract said. That's what the court agreed to. The court, when it was... When we submitted the stipulation to the court, it agreed to vacate the portion of its opinion that was at odds with this language. It's just stipulated. I'm just... I'm sorry to give you a hard time. I'm just having a hard time. I mean, even if you look at quanta and you look at the distinction that the Supreme Court drew between it and the... What's the opinion? The general talking pictures case. It's a little hard to think about and really appreciate unless you're looking at the portions of the license that they cited and so forth. So I'm having a hard time doing that, in this case, in the absence of the actual documents. I apologize. And characterization of documents is one thing. I mean, when you look at all these cases, who the heck knows what these different characterizations mean. It seems a little difficult for me, at least. Fair point. I understand that. In accordance with the Federal Circuit rules, no one cited that page in the appendix. Therefore, it wasn't included as part of the joint submission. But if I could briefly sum up, then, in our opinion, to rule an impression's favor on this appeal would require the court to adopt three untenable positions. First, it would have to ignore the stipulated facts, that this is a valid, enforceable, conditional sale, and single-use restriction. Two, it would have to conclude that the Supreme Court not only intended to overrule Malencroft and Jazz Photo, but also its decisions in Bosch and General Otake pictures, in my opinion. And lastly, it would decide that the you'd have to decide that the Supreme Court dramatically changed the well-settled parameters of patent exhaustion that have existed for approximately a century. Based on that, based on the stipulated facts and the binding precedent, we think that a ruling in Lexmark's favor on both issues is appropriate. Thank you. Thank you. Can you respond to the General Talking Pictures argument? Sure. Basically, I agree with everything the questions you asked, which was... Why don't we add two more minutes just to keep the time even between you and your friend. Thank you, I appreciate that. General Talking Pictures was a license to a manufacturer with restrictions on how that manufacturer could sell the product. And they were only allowed to sell it for personal use, not for commercial use. And they went ahead and violated the term of that license agreement. First place, it was a negotiated license signed, which is different from what we have here, between the licensee and the licensor. So there were no... There were restrictions on the ability of the license or to sell the product. Well, don't we have you stipulating that there are restrictions on the ability of the reseller to sell the product?  The stipulation... Again, we don't have the contract, but as it's characterized, is that they have to agree to sell the cartridges pursuant to the program. And the program is with the license on them. So they have to sell the products as they get them from the manufacturer to the consumer. And that's it. So you're saying paragraph 23, the middle left paragraph, where it says the resellers are only authorized to resell the return program cartridges subject to the contractual return program condition. Yes. And to me, that's very similar to Intel. There were restrictions placed on Intel that they could sell, but they had to inform the purchasers that there were conditions on the purchasers. And that's what we have here. They agree to sell them, 72 conditions put on the purchasers. But they themselves were unrestricted in their ability to sell, just as Intel was. So there's nobody telling retailers, you can't sell this product to certain people. The retailers, like Staples, they have them on their shelves. People come in and buy them. They buy them. This is on this license, in quotes, is on the package. And that's the extent of the retailer's obligation. There's no restrictions on to whom the retailer can sell the products. They just have to sell them based on what the conditions contained on the product itself. In other words, they couldn't take the packaging and cross that out or remove that, the attempted restrictions. Do we need to overturn Malincroft to decide in your favor on this issue? I think so. I think so. And again, here I am asking you to do the impossible. But I think Malincroft, first place I think Malincroft was bad law. I mean, I remember when it came down. Well, this has been a little trickier than perhaps the first discussion we had earlier. Yes. Because we only, we arguably, a panel has the authority to overturn precedent if it's, you know, undeniably clear that the Supreme Court has changed it. I know you're making that argument, and Kurt's saying you're not making the same argument for Quanta, right? Or are you? Well, yeah, I think we are. And it's hard to distinguish, in my mind, between Quanta and Malincroft. It's really hard to draw, and there may be one there, but at least as far as this particular case is concerned, I really have a hard time, and that's why both of the district judges that have looked at this thing have said, to the extent that Malincroft is inconsistent with Quanta, we hold that Malincroft has been sub silencio overturned, which is their, the district judge's, correct right to do, as it is your right to do if you agree with that. Malincroft really was, it's kind of the same thing. It was a seller put a label, I'm going to call them a label license, on the products, and then they were sold. The key distinction is sale of a product as opposed to license to manufacture of a product. Under exhaustion, when you sell a product and you're authorized to sell that product, that's the end of it as far as your patent rights are concerned. Contract rights, sure, you may or may not have an enforceable contract depending upon the state law, but as far as patent rights are concerned, it's pretty clear. I think I talked about, poetically referred to the Gossamer threads of holding on to patent rights. Patentees have notoriously tried to find ways to hold on to their patent rights after they've sold the product. But I think that Quanta was pretty much affirming the general principle that if you sell something, then that's it. You don't have any more patent rights. You may have a contract right, but you don't have any more patent rights once you dispose of it. And how was that limited by general talking pictures? General talking pictures was at nothing, the right to sell was limited. So general talking pictures had a license, again, to manufacture and a limited right to sell to a limited customer base. And your friend would say that you were limited here because you were required to put the, there was a condition put on it. As was Intel. Intel had the same obligation. As I'm saying, it's hard to distinguish Quanta from what happened in this case and the facts in Mellenbrot. I think they're all of the same. Is Frinko a problem for you? I'm sorry? Frinko? I don't think so because Frinko essentially, as I read it, was free Quanta and basically just followed Mellenbrot. So I think Mellenbrot is bad law and I think Quanta essentially, just like the two judges, I think it's been overturned by Quanta. Thank you. Thank you very much.